560 So.2d 611 (1990)
STATE of Louisiana
v.
Vivian HECK.
No. 89-KA-0657.
Court of Appeal of Louisiana, Fourth Circuit.
April 12, 1990.
*612 Harry F. Connick, Dist. Atty., Brian T. Treacy, Charmagne Padua, Asst. Dist. Attys., New Orleans, for plaintiff-appellant/appellee.
Michael Reihlman, William R. Ary, New Orleans, for defendant/appellant.
Before LOBRANO, WILLIAMS and ARMSTRONG, JJ.
*613 LOBRANO, Judge.
On August 11, 1988, defendant Vivian Heck was indicted with the second degree murder of Mark Stafford. On September 27, 1988, a twelve member jury found her guilty as charged. Her motion for modification of verdict, filed October 5th, was granted on November 7, 1988 reducing her conviction to manslaughter. On November 17th, Heck was sentenced to serve eighteen years at hard labor, the first five without benefit of parole, probation, or suspension of sentence pursuant to C.Cr.P. Art. 893.3.
The State appeals the judgment notwithstanding the verdict, assigning as error the trial court's modification of the jury's verdict from second-degree murder to manslaughter.
Heck appeals asserting the following:
1) There was insufficient evidence to support her conviction for manslaughter;
2) The trial court should not have allowed the State to impeach the testimony of her son with prior inconsistent statements;
3) Her due process and confrontation rights were abrogated when the State failed to produce pertinent evidence;
4) The trial court erred in sentencing her pursuant to C.Cr.P. Art. 893.1 et. seq.
FACTS:
On April 12, 1987, at approximately 1:00 p.m., Heck and her boyfriend, the deceased Mark Stafford, engaged in a heated argument. She was angry at his decision to go "three wheeling" rather than pursue a tax matter which could result in the seizure of the property they shared by the Internal Revenue Service. In addition, Heck forbade her thirteen year old son, Bradley Pheffer, to accompany Stafford and his friend, Gerard Jones. She then left the house in order to telephone Stafford's father, but was detained and did not make the call. Upon returning home, Heck discovered that Stafford, Jones and her son had gone.
Along with her mother, Heck went to several places where she knew the men three-wheeled in search of her son. She did not find them. She and her mother then went across the lake to look at property, during which time she consumed a few beers.[1] She returned home later that evening.
At approximately 8:00 p.m., Stafford, Jones and Bradley returned home and began unloading the vehicles from their truck. Heck had let the dogs out, and the front door was open. The dogs barked when the men and Bradley arrived. They were laughing and talking as they unloaded the vehicles. At that time, Heck looked outside and slammed the door shut.[2] Jones remarked to Stafford that it looked like he had been locked out of the house. Stafford apparently approached the door of the house, at which time a shotgun blast was heard, and Stafford was found lying face down with his head near the door, shot through the head, chin and neck with tripleaught buckshot. The door was shut and there were no witnesses to the actual shooting.
Bradley and Jones ran toward Stafford. They saw Heck come out of the house, look down at Stafford and begin screaming and crying hysterically. Jones, who testified that Heck flipped Stafford over on his back, left to call the police.
Various experts testified at trial that the shot was fired from within the residence, traveling in a slight downward projectory, tearing through a door frame and a frosted glass window at a height of three feet, eight inches from the floor.[3] The pellets *614 struck Stafford in the head, chin and neck. Since Stafford was over six feet tall, the pathologist testified he had to have been bent from the waist in a downward position next to the door and window when the shot was fired.
Heck testified that the shooting was an accident, and that she had no experience loading or firing the twelve-gauge shotgun which Stafford kept in the house. She stated that at the time of the shooting, she was no longer angry with Stafford, and that she was seated with the shotgun on her lap with the intention of merely scaring him when he returned home. She stated that the gun fired accidentally. She testified she did not even know he was home when she stood up as he approached the door.
In rebuttal, the state called Officer Treadway, a ballistics and firearm examination expert. He testified that he test fired the gun using the same ammunition with which Stafford had been killed. He found that the gun required four and one half pounds of pressure exerted on the trigger in order to fire it, rebutting the theory of an accidental firing. Because he received a bruise when firing the gun, even when bracing it, Officer Treadway theorized that Heck would have been injured had she fired the gun without bracing it, and that the gun would have flown out of her hands. He also stated that the scatter pattern of the pellets in the door indicated that the gun could have been fired from up to twenty-six feet from the door.
Although the jury found Heck guilty of second degree murder, the trial court reduced the verdict to the lesser response of manslaughter. In his reasons for judgment, the trial judge found that the gun had not been fired accidentally. He also stated that because there were no witnesses to the shooting, the prosecution had to prove the elements of second degree murder by circumstantial evidence only. He opined that even when viewing the evidence in the light most favorable to the prosecution, the State was unable to meet its burden of proof. Instead, the circumstances pointed to one of two hypotheses. Heck either had the specific intent to kill Stafford, but was angry to the point that she was deprived of self control and cool reflection, or she was engaged in the perpetration of an aggravated battery or aggravated assault without the intent to kill or inflict great bodily harm. According to the trial court, either of these hypotheses would yield a verdict of manslaughter.
ASSIGNMENT OF ERROR 1:
Heck contends by her first assignment of error that there was insufficient evidence to support her conviction for manslaughter. By its sole assignment of error, the State contends the trial court erred in granting the defendant's motion for modification of the second degree murder verdict to manslaughter. Because both these assignments concern the sufficiency of evidence to convict the defendant, they will be discussed together.
The defendant filed her motion for modification of the verdict pursuant to C.Cr.P. Art. 821, which provides in pertinent part:
"C. If the court finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of a lesser included responsive offense, the court, in lieu of granting a post verdict judgment of acquittal, may modify the verdict and render a judgment of conviction on the lesser included responsive offense."
Thus, a trial court may modify a jury verdict and render a conviction of a lesser included responsive verdict only if it finds that the evidence, viewed in a light most favorable to the state, supports only a conviction of that responsive verdict. State v. Arabie, 496 So.2d 554 (La.App. 1st Cir.1986), writ denied 502 So.2d 565 (1987).
In evaluating the sufficiency of evidence to support a conviction, an appellate court must determine whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. Jackson v. Virginia, *615 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Jacobs, 504 So.2d 817 (La. 1987). Where the conviction is based upon circumstantial evidence, R.S. 15:438 provides that such evidence must exclude every reasonable hypothesis of innocence. State v. Langford, 483 So.2d 979 (La.1986). R.S. 15:438 does not establish a stricter standard of review than the more general rational juror's reasonable doubt formula; it is merely an evidentiary guide for the jury when considering circumstantial evidence. State v. Porretto, 468 So.2d 1142 (La.1985).
Heck was charged with and convicted by the jury of second degree murder, which is defined in pertinent part as: "The killing of a human being: (1) When the offender has a specific intent to kill or inflict great bodily harm." R.S. 14:30.1. The trial court modified this verdict to manslaughter, which is defined by R.S. 14:31 as:
"Manslaughter is:
(1) A homicide which would be murder under either Article 30 (first degree murder) or Article 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that the offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed; or
(2) A homicide committed, without any intent to cause death or great bodily harm.
(a) When the offender is engaged in the perpetration or attempted perpetration of any felony not enumerated in Articles 30 or 30.1, or of any intentional misdemeanor directly affecting the person; or
(b) When the offender is resisting lawful arrest by means, or in a manner, not inherently dangerous, and the circumstances are such that the killing would not be murder under Articles 30 or 30.1."
"Heat of blood" and "sudden passion" are not elements of the crime of manslaughter, but are mitigating factors which lessen the degree of culpability of the homicide. State v. Lombard, 486 So.2d 106 (La.1986). Because these are mitigating factors, the defendant must establish them by a preponderance of the evidence in order for a verdict of manslaughter to be appropriate. Id. at 111.
In its reasons for judgment, the trial court found that the gun had not been fired accidentally, given the testimony of the ballistics expert. In addition, the trial court noted Heck's initial anger at Stafford and her son, and stated that this anger had been rekindled when the men returned in a "joking, playful and happy mood." The court then found, as was noted supra, that the shot had been fired either with intent to kill but without cool reflection, or during the perpetration of an aggravated battery or aggravated assault.
Heck consistently maintained at trial that the gun accidentally discharged. She stated that she was no longer angry, and that she did not even know the men had arrived at home. Considering the rule of law that the defense must raise and prove the mitigating factors of heat of blood or sudden passion, the trial court's first manslaughter hypothesis is not available to Heck.
Aggravated battery, a felony, is defined by R.S. 14:43 as a battery (the intentional use of force or violence upon the person of another, R.S. 14:33) committed with a dangerous weapon. Aggravated assault, an intentional misdemeanor, is defined by R.S. 14:37 as an assault (an attempt to commit a battery, or the intentional placing of another in reasonable apprehension of receiving a battery, R.S. 14:36) committed with a dangerous weapon. Here, Heck admitted that she picked up the shotgun with the intent to scare Stafford when he came in the house. She stated, "Alls [sic] I could think of was to scare him to make him realize things needed to be done and play time left for other days." The defendant admitted she killed Stafford while in the perpetration of an aggravated assault without any intent of causing death or great *616 bodily harm. Thus the trial court's second manslaughter hypothesis was correct. However, this does not end the inquiry. In order for the trial court's modified verdict to stand, this court must find that the evidence supported only the manslaughter verdict and could not also support a finding of second degree murder.
Second degree murder is the killing of a human being with the specific intent to kill or inflict great bodily harm. There were no witnesses to the shooting, thus the evidence is entirely circumstantial. Viewed in the light most favorable to the prosecution the evidence should hypothesis of innocence.
As previously noted, the ballistics expert testified that the shooting could not have been accidental. The evidence implies that Heck was aware the men had returned. The dogs were barking and both Bradley and Jones testified Heck looked out of the door before slamming it shut. The evidence also implies she was angry at the time. The evidence is not clear whether Heck could see through the glass window in the door, and was thus able to determine Stafford was on the other side.
Heck's reaction subsequent to the shooting negates any specific intent to kill. Jones testified:
"Q. And then what did she do after she opened the door, she closed it?
A. No, no. She looked down at Mark and flipped him over, you know. That's when I saw the pool of blood by his head, there. And she started screaming and stuff.
* * * * * *
Q. When did she get excited, when she saw where you were looking?
A. When sheyeahwhen she looked down and saw Mark laying there, that's when she
Q. Her attention was drawn to Mark by you?
A. By me, yeah.
Q. And then after she saw what you were looking at, she got excited, she got hysterical?
A. Yeah. After she flipped him over and then both of us seen a pool of blood there."
It is a reasonable conclusion that Heck was surprised at seeing Stafford lying by the door. Her attention was drawn to Stafford by Jones, and upon seeing him she began crying and became hysterical. This reaction is inconsistent with her possessing specific intent to kill.
Viewing the evidence in the light most favorable to the State, we find that they did not bear the burden of proving specific intent to the exclusion of the other reasonable hypothesis that all she wanted to do was scare Stafford.
ASSIGNMENT OF ERROR 2:
Heck argues by her second assignment of error that the trial court should not have allowed the State to impeach the testimony of her son with prior inconsistent statements he made to the police and the grand jury. This impeachment occurred during the State's examination of Bradley, its own witness.
Bradley testified that when he, Stafford and Jones arrived at the house, Heck looked out the door, and shut it. He testified that he did not know how hard she shut the door. The prosecutor then asked Bradley whether he had given a statement to the police indicating how his mother had closed the door. Although the defense objected, the prosecutor (while not in the presence of the jury) stated that Bradley had told both the police and the grand jury that his mother had slammed the door when the men arrived at the house. The court reviewed the prior statements, and ruled that they would be allowed under R.S. 15:487, as it existed at the time of trial.[4] That statute provided, in pertinent part, that one's own witness cannot be impeached unless counsel is taken by surprise by that witness' testimony. The court noted that it would allow the defense an opportunity *617 to view these prior statements and it would reserve an exception to the ruling.
R.S. 15:488 defined "surprise" as not arising "out of the mere failure of the witness to testify as expected, but out of his testifying upon some material matter against the party introducing him and in favor of the other side." We agree that the State was surprised by Bradley's statement that he did not remember how his mother closed the door. The evidence was clearly admissible for impeachment purposes. Furthermore, Heck's contention that the impeachment evidence should not have been used because it was the only evidence presented to show her intent is incorrect. Bradley's original statement was corroborated by Jones' testimony. He also stated that Heck slammed the door.
Heck further argues that Bradley's prior statements should not have been admitted because they were taken in the absence of a concerned adult in violation of State in Interest of Dino, 359 So.2d 586 (La.1978). However, because defendant did not object on these grounds at the trial level to the introduction of the statements, she cannot now raise this claim for the first time on appeal. State v. Johnson, 489 So.2d 301 (La.App. 4th Cir.1986).
Finally, the defense argues that these statements should not have been introduced in the absence of limiting instructions to the jury as to their use for impeachment purposes only. Although defense counsel was entitled to request such instructions at trial, he did not do so, and again, cannot raise this as error on appeal.
For the above reasons, the second assignment of error is without merit.
ASSIGNMENT OF ERROR 3:
Heck contends in her third assignment of error that her due process and confrontation rights were abrogated when the State failed to produce at trial the piece of the doorframe containing the pellet holes taken from the house. She argues that this is pertinent, exculpatory evidence, and should have been presented to clear up the inconsistencies in testimony as to the translucency of the glass.
C.Cr.P. Art. 718 provides in part that a defendant may have access to any materials "which are favorable to the defendant and which are material and relevant to the issue of guilt or punishment." Materiality, as defined by United States v. Bagley, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), is shown where there is a "reasonable probability" that the outcome of the proceeding would have been different if the evidence had been disclosed to the defense.
Although the defense knew the state was in possession of the glass, counsel did not attempt to obtain access to the evidence prior to trial, nor did counsel request its production during trial. Moreover, as the State introduced a photograph of the door showing the glass, it does not appear that the actual piece of the door was relevant to the issue of guilt or punishment, nor that its production would have changed the verdict of the jury or the trial court. Finally, review of the trial transcript does not show any bad faith or deceit on the State's part in its decision not to show the actual piece of the door to the jury. For these reasons, this assignment of error has no merit.
ASSIGNMENT OF ERROR 4:
In her final assignment of error, Heck contends that the trial court erred by sentencing her pursuant to C.Cr.P. Art. 893.1 et seq. to serve the first five years of her sentence without benefit of parole, probation or suspension of sentence. She argues that the State erred by waiting until the day of trial to file its motion to impose sentence under these provisions and also that the trial court erred by failing to hold an adversarial hearing on this motion after trial but prior to sentencing.
C.Cr.P. Art. 893.1 was originally enacted in 1981, and at that time it provided:
"When the court makes a finding that a firearm was used in the commission of a felony and when suspension of sentence is not otherwise prohibited, the court shall impose a sentence which is not less than:

*618 (1) The maximum sentence provided by law, in the same manner as provided in the offense, if the maximum sentence is less than five years, or
(2) Five years, in the same manner as provided in the offense, if the maximum sentence is five years or more.
Imposition or execution of sentence shall not be suspended and the offender shall not be eligible for probation or parole."
Article 893.1 was amended and Articles 893.2 and 893.3 were added by Acts 1988, No. 319 to read:
"Art. 893.1. Motion to invoke firearm sentencing provision
A. If the district attorney intends to move for imposition of sentence under the provisions of Article 893.3, he shall file a motion within a reasonable period of time prior to commencement of trial of the felony in which the firearm was used.
B. The motion shall contain a plain, concise, and definite written statement of the essential facts constituting the basis for the motion."
"Art. 893.2. Use of firearm in commission of a felony; hearing
A. If a motion was filed by the state in compliance with Article 893.1, the court shall conduct a contradictory hearing following conviction to determine whether a firearm was used in the commission of the felony.
B. The court may consider any evidence introduced at the trial on the merits, at defendant's guilty plea, or at the hearing of any motion filed in the case. The court may consider any other relevant evidence presented by either party at the contradictory hearing. The hearsay rule shall not be applicable at such contradictory hearings.
C. The motion shall be heard and disposed of prior to the imposition of sentence."
"Art. 893.3. Sentence imposed on felony in which firearm was used
A. If the court finds by clear and convincing evidence that a firearm was actually used by the defendant in the commission of the felony for which he was convicted, the court shall impose the maximum sentence of imprisonment provided by law if the maximum sentence is less than five years and shall impose a sentence of at least five years if the maximum sentence exceeds five years.
B. A sentence imposed under this provision shall not be suspended and shall be imposed in the same manner as provided in the felony for which the defendant was convicted.
C. The court may order that a defendant sentenced under this provision shall not be eligible for parole for a specified period of time not to exceed five years.
D. If the court finds that a sentence imposed under provisions of this Article would be excessive, the court shall state for the record the reasons for such finding and shall impose the most severe sentence which is not excessive."
In State v. Martin, 351 So.2d 92 (La. 1977), the Louisiana Supreme Court held that procedural changes apply to trials conducted subsequent to the date of the procedural amendment, not the procedural law on the date of the offense. Arts. 893.1 through 893.3 are procedural in nature. The amendments were enacted effective September 9,1988 and the trial did not take place until September 27, 1988. We conclude that the amended statute is applicable to the instant case and find that the State's notice under Article 893.1, filed immediately prior to jury selection, was not "within a reasonable period of time prior to commencement of trial."
Accordingly, we affirm defendant's conviction, but vacate her sentence and remand for resentencing consistent with this opinion.
CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING.
NOTES
[1] While Heck admitted to drinking a few beers, she insisted she was not intoxicated, and did not raise intoxication as a defense.
[2] Although Bradley first testified that his mother merely shut the door, this testimony was impeached with the statement he made to the police on the night of the shooting and his grand jury testimony, both of which indicated that Heck looked out and slammed the door shut. Furthermore, Jones testified at trial that the door had been slammed.
[3] There was conflicting testimony about the degree of translucency of the glass. Some witnesses testified that they could distinguish the identities of people standing on the other side of the window, while other witnesses testified that such a distinction could not be made. Heck maintained that she could not see Stafford through the glass.
[4] This provision has since been repealed and is now contained in the new Louisiana Code of Evidence. These new provisions became effective on January 1, 1989. However, because trial occurred on September 27, 1988, the old provisions of R.S. 15:587 apply to this case.